# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

LISA C. BOURASSA,

        Plaintiff,

vs.

                              **Civil Action 2:11-cv-00235**
                              **Judge Gregory L. Frost**
                              **Magistrate Judge E.A. Preston Deavers**

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

      Plaintiff, Lisa C. Bourassa, filed this action seeking review of a final decision of the Commissioner of Social Security  ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. In her applications, which she filed on September 4, 2007, Plaintiff alleged that she had been disabled since July 21, 2003,[1] due to Patella syndrome, ankle fusions, bursitis, fibromyalgia, asthma, irritable bowel syndrome, and severe depression.  (R. at 179-81, 182-85, 195.)

      After initial administrative denials of her claim, Plaintiff appeared and testified at a video hearing before an Administrative Law Judge ("ALJ") on October 29, 2009.  ( R. at 31-67.) A vocational expert also testified at the hearing.  (*Id.*)  On November 24, 2009, the ALJ issued

---

[1]  Plaintiff previously applied for benefits on October 20, 2004, alleging a disability onset date of July 21, 2003.  (R. at 162-63.)  On August 4, 2007, an ALJ issued a written decision denying Plaintiff's benefits applications.  (R. at 34, 189.)  At the October 29, 2009 administrative hearing for her current applications for benefits, Plaintiff amended her alleged onset date to August 5, 2007.  (R. at 15, 34.)

an unfavorable decision denying benefits.  ( R. at 15-24.)  This decision became the final

decision of the Commissioner when the Appeals Council denied review on January 18, 2011.  (

R. at 1-5.) Plaintiff thereafter timely commenced this civil action.

In her Statement of Errors, Plaintiff contends that the ALJ erred in weighing the medical

opinion evidence and assessing Plaintiff's credibility.  Following the Commissioner's

Memorandum in Opposition, the matter is now ripe for decision.  For the reasons that follow, it

is **RECOMMENDED** that the Court **REMAND** this case for further consideration consistent

with this Report and Recommendation.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff, who was thirty three years old at the time of the administrative hearing, has a

high school education with one year of college.  (R. at 22, 200, 202.)  Her past relevant work was

as a head janitor/account manager in retail cleaning.  ( R. at 196.)

At the administrative hearing, Plaintiff testified that fibromyalgia caused her pain nearly

every day.  ( R. at 38.)  At one point, Plaintiff described her fibromyalgia as a light pain that did

not prevent her from getting up in the mornings.  (R. at 41.)  Plaintiff, however, also indicated

that her fibromyalgia made her skin sore to the point that it hurt for her clothes to touch her skin.

(R. at 42.)   Plaintiff stated that when she experiences a flare up, she has burning and aching

sensations.  (*Id.*)  She noted that her fibromyalgia also caused swelling in her joints, ankles,

knees, hands, and feet.  (*Id.*)  She further reported that her fibromyalgia flared up with rainy

weather.  ( R. at 42.)

Plaintiff testified to experiencing back and neck pain that was distinct from, and more

severe than, her fibromyalgia.  (R. at 41.)  Plaintiff indicated that this pain began when she fell

out of a tree and broke both ankles in 2004.  ( R. at 39.)  Shortly thereafter, Plaintiff began

experiencing increased back and neck pain.  (*Id.*)  Plaintiff stated that when her back and neck

hurt she was unable to get up in the morning or get dressed.  (*Id.*)  Plaintiff testified that her neck

pain shot up from her shoulder blades through the back of her neck and sometimes her left arm

went numb all the way down to her fingers.  ( R. at 43.)  She noted that the numbness and feeling

of pins in her arm happened once or twice per week.  (*Id.*)  According to Plaintiff, trigger point

injections did not help this pain.  (R. at 41–42.)  Her doctor recommended stretching exercises,

but Plaintiff reported that she did not do these exercises because they caused her pain to flare up.

(R. at 53.)

Plaintiff testified that she received cortisone injections to treat bursitis in both hips.  (R.

at 40.)  According to Plaintiff, these injections provide her relief for only a day or two.  ( R. at

44.)  Plaintiff stated that she walks with a limp because of her hips, and has used a cane since

March 2008.  (*Id.*)  Plaintiff noted that her hip pain was not constant, but occurred one to three

days per week.  (*Id.*)  Plaintiff reported that she tried water therapy but her pain level was too

high so she was referred back to her physician.  (R. at 45.)

Plaintiff indicated that she has problems with depression.  She reported feeling both sad

and embarrassed due to her physical condition.  (R. at 49–51.)  She noted that she experiences

crying spells and mood swings three to four times per week.  (R. at 51.)  Plaintiff found

counseling helpful.  (R. at 49, 51.)  Plaintiff also noted that she has problems sleeping through

the night due to her pain.  (R. at 52.)

Plaintiff testified that she did not do many household chores, as she relied on her

daughter and parents for assistance.  (R. at 46-47.)  Plaintiff reported that since the winter of

2008, she has had more difficulty doing things with her daughter and around the house. ( R. at 47.) She testified that she was unable to grocery shop alone. ( R. at 48.) She was able to go from the car to a cart. (*Id.*) She asked for assistance with things like lifting pop, milk, juice, and loading her car. (*Id.*) She could only carry light things in the house like bread and chips. (*Id.*) Plaintiff testified that her mother did all of her laundry. (*Id.*) Plaintiff also noted that she had difficulty climbing stairs. (*Id.*)

In considering her ability to perform work-related activities, Plaintiff reported problems with sitting because it was too painful, her knees bothered her, and her feet went numb. ( R. at 51.) She testified that her doctor instructed her not to lift anything heavier than a gallon of milk. ( R. at 53.) She noted that she had problems with balancing and was unable to stoop. ( R. at 55.) Plaintiff also estimated that she could kneel for very short periods of time, but could not crouch because it was too painful. ( R. at 56.) She testified that she was able to crawl, but would have to use furniture to pull herself back up. (*Id.*) She stated that she had problems with cold temperatures. (*Id.*) Plaintiff reported that the most comfortable position for her was to be on the couch or in a recliner with her feet up and curled in a ball. ( R. at 57-58.) She stated that she spent six to eight hours per day in that position. ( R. at 58.)

### III. MEDICAL RECORDS[2]

A.    <u>Dr. Harvey</u>

    1.    <u>Treatment Records</u>

The record contains treatment records from family physician, Ronald Harvey, M.D., from February 2005 to August 2009. ( R. at 310-21, 380-402, 458-67.)

On September 28, 2006, Plaintiff complained of pain in her mid back shooting down both legs to her knees. ( R. at 391.) Plaintiff noted that her podiatrist felt there may be a problem with her back since they had not been able to improve her foot and leg condition with surgery and treatments. (*Id.*) Dr. Harvey observed Plaintiff was "her typical demonstrative self" during the examination. (*Id.*) Examination revealed that deep tendon reflexes, muscle strength, and sensation were all unremarkable. (*Id.*) Straight leg raising revealed some increased pain. (*Id.*) At this time, Dr. Harvey found Plaintiff's progressive leg and back pain to be of an unclear etiology. (*Id.*)

On October 18, 2006, Plaintiff presented with leg pain so severe that she could hardly walk. ( R. at 390.) Dr. Harvey noted that Plaintiff had no known injury. (*Id.*) Dr. Harvey reported an MRI of the lumbosacral spine with normal findings. (*Id.*) An EMG of Plaintiff's lower extremities was negative. (*Id.*) Plaintiff denied any real trauma and stated that she experienced no numbness or tingling elsewhere. (*Id.*) Examination showed positive straight leg raising with pain in both legs increased by motion. (*Id.*) Plaintiff had a fair amount of pain to

---

[2] Plaintiff's contentions of error primarily focus on the ALJ's assessment of her physical impairments. Accordingly, the Court will focus its review on medical evidence relating to Plaintiff's physical conditions. Nevertheless, the undersigned acknowledges that Plaintiff is alleging disability in part due to depression.

light palpation of the legs. (*Id.*) Range of motion of the knees and ankles were unremarkable, but painful. (*Id.*) Dr. Harvey found paresthesias in the lower extremities of unclear etiology with no obvious significant neurologic findings. (*Id.*)

In late November 2006, Plaintiff saw Dr. Harvey for complaints of pain associated with her bursitis. (R. at 389.) Dr. Harvey prescribed physical therapy and advised Plaintiff to quit smoking. (*Id.*) During her December 21, 2006 examination, Plaintiff reported to Dr. Harvey that she was having pain "everywhere" including her hips, legs, and back. ( R. at 388.) Upon examination, Plaintiff complained of pain to palpation in every muscle from her legs to hips. (*Id.*) Dr. Harvey diagnosed Plaintiff with fibromyalgia. (*Id.*) In February 2007, Dr. Harvey's examination notes reflected that deep tendon reflexes, muscle strength, and sensation all seemed intact. (R. at 386.) He diagnosed fibromyalgia and no new problems. (*Id.*)

In May and August 2007, Dr. Harvey continued to see Plaintiff for fibromyalgia. ( R. at 382, 384.) He also treated Plaintiff for depression. (R. at 384.) On November 28, 2007, Plaintiff reported that her fibromyalgia had been "really bad lately" and that she was having difficulty getting out of bed. (R. at 381.) Dr. Harvey noted that during examination Plaintiff seemed to have tenderness everywhere. (*Id.*) Dr. Harvey diagnosed Plaintiff with fibromylagia and diffuse pain of unclear etiology. (*Id.*) He prescribed Lyrica. (*Id.*)

On February 11, 2008, Plaintiff reported numbness and tingling in her arms and legs and she had trouble controlling her urine, noting two accidents. (R. at 321.) Dr. Harvey noted that Plaintiff seemed to be walking with a "somewhat [] bazaar gait." (*Id.*) Dr. Harvey ordered an MRI of the brain, which was negative. (R. at 342.) On February 21, 2008, Dr. Harvey diagnosed Plaintiff with bilateral bursitis in the trochanteric area after examination revealed "a

lot of tenderness to palpation in both trochanteric bursas" and Plaintiff received an injection. (R. at 320.)

In March 2008, Plaintiff presented to Dr. Harvey with hip, neck, and back pain, noting that her fibromyalgia had been quite severe for the past several weeks to the point where she was really unable to function at all. (R. at 319.) Dr. Harvey diagnosis was "diffuse myalgias, fibromyalgia type picture, and flare up of unclear etiology." (*Id.*) Dr. Harvey noted that he had no new treatment to offer Plaintiff and referred her to a fibromyalgia specialist. (*Id.*) On April 23, 2008, Plaintiff was using a cane and was partially bent over. (R. at 315.) Dr. Harvey indicated that Plaintiff was "somewhat dramatic, but does not appear to be in any acute distress at this time." (*Id.*)

Plaintiff reported that her fibromyalgia was getting worse and that she "hurt[] everywhere" in October 2008. (R. at 312.) Dr. Harvey's notes reflect that Plaintiff was "fairly histrionic" during the examination. (*Id.*) Dr. Harvey informed her that she would have to "ride with" the waxing and waning of her symptoms. (*Id.*) On October 16, 2008, Plaintiff was treated with cortisone injections in her hips and diagnosed with recurring trochanteric bursitis. (R. at 311.)

Dr. Harvey re-filled her medications on March 30, 2009, and noted no real change in her fibromyalgia condition. (R. at 461.) At this time, Plaintiff reported being under a great deal of stress because she was caring for her mother, who had severe alcoholic dementia. (*Id.*) Dr. Harvey felt that the excess stress was likely adding to Plaintiff's symptomatology. (*Id.*) In June 2009, Dr. Harvey noted that Plaintiff was doing a little better than usual, though she still complained of aches, pains, and fatigue. (R. at 460.) He reported that Plaintiff "pretty much has

had every therapy known to science to this point." (*Id.*) On August 18, 2009, Plaintiff stated that she was bruising easily on her arms and legs. ( R. at 459.) Dr. Harvey observed that Plaintiff was suffering from diffuse bruising of an unclear nature and noted that her fibromyalgia and chronic fatigue were unchanged. (*Id.*)

    2.   <u>Evaluation</u>

In December 2008, Dr. Harvey completed a "Physical Residual Functional Capacity Questionnaire" regarding Plaintiff. ( R. at 361-65.) Dr. Harvey listed her diagnoses as fibromyalgia and chronic depression with a poor prognosis. ( R. at 361.) He reported that Plaintiff experiences chronic pain, weakness, dizziness, and extreme fatigue. (*Id.*) Dr. Harvey reported that there were no clinical findings to support his opinions, but noted that the objective signs were pain to palpation. (*Id.*) He further reported that Plaintiff did not respond to most medicines including narcotics and antidepressants. (*Id.*) Dr. Harvey indicated that emotional factors contributed to Plaintiff's symptoms, identifying depression and anxiety as psychological conditions affecting Plaintiff's physical condition. (R. at 362.)

Dr. Harvey reported that in a typical workday, Plaintiff's experience of pain or other symptoms would constantly be severe enough to interfere with attention and concentration needed to perform even simple work tasks. (*Id.*) He opined that Plaintiff would be incapable of even "low stress" jobs. (*Id.*) According to Dr. Harvey, Plaintiff can only stand and sit five minutes at one time and only sit and stand/walk for less than two hours each in an eight-hour workday with normal breaks. ( R. at 362-63.) Plaintiff would need a job that permitted shifting positions at will and unscheduled breaks. (*Id.*) Dr. Harvey noted that with prolonged sitting, Plaintiff's legs should be elevated. (*Id.*) Dr. Harvey stated that Plaintiff can never lift, and can

rarely look down, turn her head right or left, look up, or hold her head in a static position. ( R. at 364.)  He reported that Plaintiff can rarely twist or stoop and can never crouch, climb a ladder, or climb stairs.  (*Id.*)  Dr. Harvey concluded that, on average, Plaintiff would be absent more than four days per month from work as a result of her impairments or treatment.  (*Id.*)

B.    Dr. Somple

Consulting neurologist, Michael J. Somple, M.D., evaluated Plaintiff for low back pain on October 23, 3006.  (R. at 264-65.)  Plaintiff reported lower back pain radiating into her lower extremities.  (*Id.*)  Plaintiff had normal strength, range of motion, sensation and coordination throughout, and no swelling.  (*Id.*)  She had a normal gait and station.  (*Id.*)  Electromyographic testing was unremarkable and a MRI of the lumbar spine was negative.  ( R. at 264, 371, 375.)  Dr. Somple diagnosed lumbar sprain and recommended a conservative treatment program focusing on physical therapy.  ( R. at 264-65.)

C.    Dr. Mikulik

Plaintiff treated with rheumatologist, Zhanna Mikulik, M.D., from November 2006 to January 2009.  ( R. at 322-30, 403-09, 417-21.)  Plaintiff initially saw Dr. Mikulik on referral from Dr. Harvey on November 21, 2006.  ( R. at 408-09.)  She complained of pain in her legs, from her hips down, and in the back of her knees for two years.  (*Id.*)  Her pain had been getting progressively worse.  (*Id.*)  Dr. Mikulik reported that an EMG and MRI of Plaintiff's knee were normal.  (*Id.*)  Dr. Mikulik diagnosed trochanteric bursitis and made a notation that Plaintiff's pain may be alcohol induced-neuropathy.  (*Id.*)

Dr. Mikulik saw Plaintiff again in August 2007.  (R. at 405.)  Plaintiff reported that injections in her hip and knees did not relieve her pain.  ( *Id.*)  Dr. Mikulik's examination

revealed no synovitis, but did uncover tenderness at the trochanteric bursa. (*Id.*) Dr. Mikulik noted that Plaintiff probably had early osteoarthritis and exhibited symptoms of fibromyalgia. (*Id.*)

On January 6, 2008, Plaintiff complained of severe pain in her back located behind her shoulders and going down her spine. (R. at 418-19.) Plaintiff noted she had started water aquatic therapy, but was discharged because it was not improving her pain. (*Id.*) Dr. Mikulik's treatment notes also reflect that Plaintiff had failed physical therapy. (*Id.*) An MRI of her whole spine demonstrated slight to moderate spondylosis in her thoracic spine; slight central protrusion C5-C6 disc with minimal to slight pressure effects on the anterior aspect of the facet in her cervical spine; and unremarkable findings in the lumbar spine. (*Id.*) Plaintiff had 18 fibromyalgia tender points upon examination. (*Id.*) Dr. Mikulik diagnosed chronic back pain, noting that the MRI had showed mild degenerative changes, as well as fibromyalgia. (*Id.*) Dr. Mikulik referred Plaintiff to a spinal clinic to be evaluated for injections. (*Id.*)

In April 2008, Dr. Mikulik noted that Plaintiff had 18 of 18 fibromyalgia tender points, but a full range of motion in all of her joints. ( R. at 327-28.) She was tender to any touch in her spine area. (*Id.*) On May 6, 2008, Dr. Mikulik reported that X-rays demonstrated unremarkable findings in the cervical spine, mild spurring in the thoracic spine, and anterior spurring at the level L3, L4, and L5 in the lumbar spine. (R. at 329.) Testing as to the sacroillac joints was unremarkable. (*Id.*) Dr. Mikulik recommended regular exercise for Plaintiff's fibromyalgia, and Plaintiff reported that she had started to walk more. (*Id.*)

On August 5, 2008, Dr. Mikulik reviewed Plaintiff's pain diary. (R. at 325.) Dr. Mikulik observed that the trend since May was for Plaintiff to have more good days than bad days. (*Id.*)

Some days she was full of energy with no pain, but other days she stayed in bed. (*Id.*) Once again, examination revealed 18 out of 18 fibromyalgia tender points. (*Id.*) Dr. Mikulik assessed Plaintiff with Low Vitamin D level, chronic back pain/degenerative disc disease, fibromyalgia, and dizzy spells. (*Id.*)

In November 2008, Plaintiff complained that she was in pain all the time. (R. at 323.) Plaintiff denied any swelling of her joints. (*Id.*) Dr. Mikulik opined that Plaintiff's complaints of chronic back pain were "disproportional to my physical examination and findings on x-rays." (*Id.*) She ordered an MRI in hopes to "find a reason for her back pain . . . ." (*Id.*) Dr. Mikulik indicated that Plaintiff's depression was affecting her fibromyalgia. (*Id.*) She encouraged Plaintiff to seek counseling as well as swimming and water aerobics. (*Id.*) A November 11, 2008 MRI of Plaintiff's cervical spine showed a slight central protrusion C5-6 disc with minimal to slight pressure effect upon the anterior aspect of the sac. ( R. at 332.) An MRI of the thoracic spine on the same day showed slight to moderate spondylosis. ( R. at 333.)

D.    State Agency Evaluations

State agency physician Gerald Klyop, M.D., evaluated Plaintiff's physical residual functional capacity on October 29, 2007. (R. at 299–306.) Dr. Klyop did not independently assign RFC limitations. (*See id.*) Instead, Dr. Klyop indicated that he was adopting the RFC decision that a prior ALJ gave on August 4, 2007 with respect to Plaintiff's previous application for benefits. (R. at 300, 306.) Dr. Klyop did not detail what medical evidence he considered in reaching this decision. (*See* R. at 299–306.) Furthermore, as the prior ALJ decision is not part of the record, it is unclear exactly what limitations Dr. Klyop assigned. State agency physician Esberado Villanueva, M.D., affirmed Dr. Klyop's opinion on March 17, 2008. (R. at 309.)

E.     Dr. Siefert

1.     Treatment Notes

Plaintiff presented for an initial evaluation with W.L. Greg Siefert, M.D., a pain management specialist, on January 23, 2009.  (R. at 426-28.)   Plaintiff complained of a four-year history of chronic pain in her thoracic back, neck, shoulder and bilateral hips.  (R. at 426.) She underwent injections, which did not provide significant relief.  (*Id.*)  Plaintiff noted that her neck and shoulder pain was her worst pain.  (*Id.*)  She had tried physical therapy, chiropractic care, home remedies, ice, heat, whirlpool therapy, and psychological counseling. (*Id.*)  Plaintiff rated her pain as a 9 out of 10.  (*Id.*)  Upon examination, she had full range of motion in her extremities and normal strength in her upper extremities.  (R. at 427.)  Plaintiff had reduced range of motion in her back, with extreme tenderness to palpation.  (*Id.*)  Dr. Siefert noted that diagnostic testing had revealed slight to moderate spondylosis in the thoracic spine as well as  minimal broad-based bulging of the C4-5 disc and slight central protrusion of the C5-6 disc in the cervical spine.  (*Id.*)  He reported that an EMG revealed no abnormalities and that an MRI of the lumbar spine was negative.  (*Id.*)  Dr. Siefert reported that Plaintiff's "pain appear[ed] to be more significant than her physical findings."  (*Id.*)  He advised Plaintiff to return to aqua therapy and establish a routine exercise regime, and he indicated that he would treat her with trigger point injections.  (*Id.*)

On January 27, 2009, Dr. Siefert administered trigger point injections into Plaintiff's bilateral trapezius and cervical paraspinous muscles.  ( R. at 425.)  In February 2009, Plaintiff reported to Dr. Siefert that she was having a lot of pain across her cervical region.  ( R. at 423.) Plaintiff stated that although the left side of her neck improved following trigger point injections,

she continued to have significant pain on her right side.  (*Id.*)  Examination revealed palpable tenderness over her right paracervical musculature.  (*Id.*)  Dr. Siefert's impression was cervical disc bulge, fibromyalgia, myofascial pain, and cervical radiculopathy.  (*Id.*)

From February through June 2009, Plaintiff underwent several procedures including cervical epidural steroid injections at C7-T1 and trigger point injections into the trapezius and paracervical muscles.  (*See* R. at 439–57.)  In March 2009, Plaintiff reported some decrease, 30% to 40%, in the pain in the right side of her neck following injection.  (R. at 455.)  Later in March, Plaintiff again reported some relief following injections, but noted that her pain started to return a few days after the injections.  (R. at 452.)  Plaintiff, however, still stated that her pain was decreased by 40% to 50% and that she could move her neck with less discomfort.  (*Id.*)  On April 23, 2009, Plaintiff told Dr. Seifert that her pain was 50% decreased following injections.  (R. at 448.)  Nevertheless, Plaintiff reported a new pain generator, noting pain around her shoulder blades.  (*Id.*)  Examination revealed tenderness over Plaintiff's right cervical facet joints, as well as over her rhomboid muscles, with range of motion limited secondary to pain.  (*Id.*)

In May 2009, Dr. Siefert noted that Plaintiff had a slow but steady gait and that she ambulated with the assistance of a cane.  ( R. at 443.)  Plaintiff indicated that medial branch block generated a 30-50% improvement in her pain.  (*Id.*)  Also in May 2009, Dr. Siefert prescribed Plaintiff physical therapy.  ( R. at 476, 485.)  Plaintiff attended five of nine sessions through the end of June 2009, and was returned to Dr. Seifert for care.  (R. at 469–70.)

In June and July 2009, Dr. Siefert performed medial branch neurotomy using radio-frequency ablation at C4, C5, C6, and C7.  ( R. at 435, 440.)  On July 2, 2009, Dr. Siefert

administered a cervical medial branch block due to a diagnosis of cervical facet arthropathy.  ( R. at 438.)  Plaintiff indicated, in August 2009, that she had not received relief following her radiofrequency ablation and was experiencing pain to the left side of her neck.  (R. at 433.)  The range of motion in Plaintiff's cervical spine was extremely limited secondary to pain.  (*Id.*)

On September 18, 2009, Plaintiff reported to Dr. Siefert with new pain on the left thoracic side.  ( R. at 430.)  Dr. Siefert administered trigger point injections at the left paracervical musculature and the left thoracic paravertebral musculature at T5-6.  ( R. at 431.)  On September 30, 2009, Dr. Siefert administered a left C2, C3, C4 medial branch neurotomy using radio-frequency ablation.  ( R. at 487-88.)  On October 12, 2009, Dr. Siefert listed his impression as cervical facet arthropathy recently treated using radio-frequency ablation.  ( R. at 515.)

   2.   Evaluation

On January 23, 2009, the same day as his initial examination of Plaintiff, Dr. Siefert completed a "Physical Residual Functional Capacity Questionnaire" regarding Plaintiff.  (R. at 366-70.)   Dr. Siefert indicated Plaintiff's symptoms included chronic pain to her bilateral hips, thoracic spine, cervical spine, which was described as  burning, aching, and sharp as well as fatigue.  (R. at 366.)  Dr. Siefert listed Plaintiff's diagnosis as fibromyalgia.  (*Id.*)  She had tenderness to palpation in her spine and a limited range of motion, but normal motor strength in her arms and normal reflexes.  (R. at 366.)  He did not feel that Plaintiff was a malingerer.  (R. at 367.)

Dr. Siefert opined that Plaintiff could walk less than one city block and could sit for 30 minutes at a time before needing to get up.  (*Id.*)  Plaintiff could stand for 15 minutes at one time

before needing to sit down or walk.  (R. at 368.)  Dr. Siefert also reported that Plaintiff could stand/walk for about 2 hours in an 8-hour workday with normal breaks and sit for about four hours in an eight-hour workday with normal breaks.  (*Id.*)  According to Dr. Siefert, Plaintiff would need to walk for 10 minutes at a time every 30 minutes during an eight-hour workday.  (*Id.*)  Dr. Siefert stated that Plaintiff would need a job that permits shifting positions at will and would allow unscheduled breaks.  (*Id.*)  Dr. Siefert noted that Plaintiff must use a cane or assistive device when standing/walking.  (R. at 369.)  Dr. Siefert reported that Plaintiff can rarely lift 10 pounds or less and never lift 20 pounds or more.  (*Id.*)  Dr. Siefert stated that Plaintiff could occasionally look down, turn her head right or left, look up, and hold her head in a static position.  (*Id.*)  Dr. Siefert noted that Plaintiff could occasionally twist, rarely stoop, crouch, or climb stairs, and never climb a ladder.  (*Id.*)  Dr. Siefert concluded that Plaintiff was likely to be absent from work more than four days per month as a result of her impairments or treatment.  (*Id.*)

## IV.  EXPERT TESTIMONY

Norman C. Hooge, Ph.D., testified at the administrative hearing as a vocational expert.  (R. at 58-66.)  He classified Plaintiff's past employment as a janitor as medium, semi-skilled work.  ( R. at 60–61.)

The ALJ asked Dr. Hooge to consider a person of Plaintiff's age, education and past work experience who was limited to lifting five pounds frequently, eight pounds occasionally; sitting six to eight hours in an eight hour day and stand or walk up to two hours in an eight hour day;  she would need to have a sit/stand option every 30 minutes, never climb ropes, ladders or scaffolds; can occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch and

15

crawl; no work at unprotected heights or dangerous machinery; and only occasional contact with the general public and co-workers. (R. at 62.) Dr. Hooge concluded that such a person could not perform her past relevant work but could perform sedentary, unskilled jobs, such as a cashier with 5,000 jobs in the state economy, a ticket seller with 3,500 jobs in the state economy, and an assembly worker with 4,000 jobs in the state economy. (R. at 63-64.) Furthermore, Dr. Hooge testified that if the ALJ found Plaintiff's testimony to be credible, she would not be able to perform any work. ( R. at 64.)

Plaintiff's attorney asked Dr. Hooge to consider an individual who was limited to sitting approximately 30 minutes at a time for a maximum of four hours per day, standing about 15 minutes per day for a maximum of two hours per day, and required an ability to shift positions. (R. at 65.) Dr. Hooge replied that the individual would not meet competitive requirements for work. (R. at 65-66.)

## V.  ADMINISTRATIVE DECISION

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. The ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008. ( R. at 17.) At the first step of the sequential evaluation process,[3] the ALJ determined that Plaintiff has not engaged in substantial gainful activity since

---

[3]  Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

  1.  Is the claimant engaged in substantial gainful activity?
  2.  Does the claimant suffer from one or more severe impairments?
  3.  Do the claimant's severe impairments, alone or in combination, meet or

August 5, 2007, her alleged disability onset date. (*Id.*)

Next, the ALJ found that Plaintiff has the severe impairments of chronic pain disorder, fibromyalgia, cervical facet arthropathy, status post bilateral subtalar fusion, patella syndrome, and affective/mood disorder. (*Id.*) At step three, the ALJ then determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. ( R. at 18.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ concluded that Plaintiff had the ability to perform a reduced range of sedentary work. ( R. at 19.) The ALJ assigned the following limitations to Plaintiff's ability to perform sedentary work:

> [T]he claimant is limited to lifting and/or carrying five pounds frequently, eight pounds occasionally; sitting for six to eight hours in an eight hour day; standing and/or walking for two hours in an eight-hour day with a sit/stand option every 30 minutes; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and never working at unprotected heights, working around dangerous machinery, or climbing ropes, ladders, or scaffolds.

(*Id.*) In addition, the ALJ restricted Plaintiff to occasional contact with the public and co-workers. (*Id.*) In reaching her RFC decision, the ALJ found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely

---

equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

credible. ( R. at 20.) The ALJ also performed her own review of Plaintiff's treatment notes and diagnostic testing. (R. at 20–21.) The ALJ gave little weight to the opinion evidence of Drs. Harvey and Siefert. (R. at 21–22.)

The ALJ determined that Plaintiff could not perform her past work. ( R. at 22.) Nevertheless, relying on the testimony of Dr. Hooge, she concluded there were a significant number of jobs in the national economy that Plaintiff could perform. ( R. at 23.) She found, therefore, that Plaintiff was not disabled under the Social Security Act. (*Id.*)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff contends that the ALJ committed two errors in assigning Plaintiff's RFC. First, Plaintiff maintains that the ALJ erred in weighing the medical-opinion evidence. Plaintiff specifically contends that the ALJ erred in failing to give controlling weight to the opinions of Drs. Harvey and Siefert as to Plaintiff's functional limitations. Second, Plaintiff maintains that the ALJ erred in assessing Plaintiff's credibility. For the reasons that follow, substantial evidence does not support the ALJ's weighing of the medical-opinion evidence and RFC determination. Consequently, remand is necessary.

A.     Opinion Evidence and Residual Functional Capacity

1.     Relevant Law

The ALJ must consider, and weigh, all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(d). Certain types of opinions, however, are normally entitled to greater weight. (*Id.*) For example, the ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to

provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . ." 20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d at 408.

If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In contrast, "'[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record.'" *Blakley*, 581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). Even when an ALJ does not grant a treating physician's opinion controlling weight, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, [and the] supportability of the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).

Importantly, in weighing the medical evidence, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Accordingly, "an ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the

medical evidence." *Id.* (internal quotations omitted); *see also Bledsoe v. Comm'r of Social Sec.*, No. 1:09cv564, 2011 WL 549861, at *7 (S.D. Ohio Feb. 8, 2011) ("An ALJ is not permitted to substitute her own medical judgment for that of a treating physician and may not make her own independent medical findings.")  In other terms, "[w]hile an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his own lay 'medical' opinion for that of a treating or examining doctor." *Beck v. Comm'r of Soc. Sec.*, No. 1:10–cv–398, 2011 WL 3584468, at *14 (S.D. Ohio June 9, 2011) (Report & Recommendation later adopted).

Finally, the ALJ reserves the right to decide certain issues, such as a claimant's RFC.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, in assessing a claimant's RFC, an ALJ must consider all relevant record evidence, including medical source opinions on the severity of a claimant's impairments.  *See* 20 C.F.R. §§ 404.1545(a), 416.945(a).  Additionally, this Court has noted on at least one occasion, "[t]he residual functional capacity opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[i]n making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms.'"  *Isaacs v. Astrue*, No. 1:08-CV-00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (quoting *Deskin v. Comm'r Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the [RFC] determination."); *Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012) (remanding where an "ALJ created his own RFC based on his assumptions of what [the plaintiff] could do").

2.    <u>Application</u>

In this case, Drs. Harvey and Siefert each offered medical opinions as to Plaintiff's

functional abilities.[4]  For example, Dr. Harvey opined that Plaintiff could never lift less than ten

pounds and Dr. Siefert indicated that Plaintiff could only rarely lift ten pounds or less.  Both Drs.

Harvey and Siefert suggested that Plaintiff would have to miss work more than four days a

month due to her conditions, and due to her impairments would experience good and bad days on

the job.  Dr. Harvey concluded that Plaintiff could sit two hours in a workday, while Dr. Siefert

opined that Plaintiff could sit four hours in a workday.

In reaching her RFC determination, the ALJ gave the opinions of Drs. Harvey and Siefert

little weight.  Ultimately, the ALJ assigned an RFC that was less restrictive than the opinions of

both of these doctors.  The ALJ found Plaintiff capable of lifting five pounds frequently and

eight pounds occasionally.  Furthermore, the ALJ's RFC determination does not credit the

doctors' opinions as to the day-to-day fluctuation of Plaintiff's condition and her need to miss

multiple days of work each month.  Most importantly, the ALJ found that Plaintiff was able to sit

for six hours in a workday.  This distinction ultimately proved critical to the outcome of

Plaintiff's disability determination.  Specifically, Dr. Hooge testified, in response to a

hypothetical question, that if Plaintiff was limited to only four hours of sitting each

day—consistent with Dr. Siefert's opinion—this limitation would preclude competitive work.

(*See* R. at 66.)

---

[4]  At the time of his December 2008 evaluation, Dr. Harvey had an extensive treatment
relationship and was therefore Plaintiff's treating physician.  Dr. Siefert, on the other hand, gave
his January 2009 opinion based on his initial examination of Plaintiff and was therefore only an
examining physician at the time of his opinion.

The ALJ provided several reasons for discrediting the opinions of Drs. Harvey and Siefert. Most prominently, the ALJ emphasized that Drs. Harvey and Siefert were too reliant on Plaintiff's subjective complaint, who he found to be not credible. The ALJ outlined various reasons for concluding that Plaintiff was not entirely credible. The ALJ specifically noted inconsistencies in Plaintiff's testimony and records, and stressed that Plaintiff's daily activities were not limited to the extent one would expect given her complaints. Considering the nature of Plaintiff's back and fibromyalgia conditions, there is no doubt that Plaintiff's credibility was an important factor in determining Plaintiff's RFC. After all, Plaintiff's doctors routinely recognized that her complaints of pain appeared to be in excess of the physical findings.

Nevertheless, in addition to considering Plaintiff's credibility, the ALJ also had to account for objective testing and extensive examination notes in determining Plaintiff's RFC. In particular, MRIs of Plaintiff's spine demonstrated slight to moderate spondylosis in the thoracic spine as well as minimal broad-based bulging of the C4-5 disc and slight central protrusion of the C5-6 disc in the cervical spine with minimal to slight pressure effect upon the anterior aspect of the sac. (R. at 332–33.) X-rays demonstrated mild spurring in the thoracic spine and anterior spurring at the level L3, L4, and L5 in the lumbar spine. (R. at 329.) The examination notes also document a history of trochanteric bursitis. (*See, e.g.*, R. at 311, 320, 409.) While the ALJ focused on select normal examination findings, Plaintiff's examining and treating physicians often found abnormalities during examinations including tenderness to palpation as well as reduced range of motion in Plaintiff's back. (*See, e.g.*, R. at 327, 423, 427, 433, 448.) Finally,

Plaintiff routinely exhibited 18 of 18 fibromyalgia tender points upon examination.[5] (*See, e.g.*, R. at 325, 329, 419, 421.)

Based on the current record, substantial evidence does not support the ALJ's weighing of the medical opinion evidence. Even assuming the opinions of Drs. Harvey and Siefert were not entitled to controlling weight, the ALJ was still required to weigh these opinions considering factors such as supportability, consistency, and treatment relationship. Drs. Harvey and Siefert were the only physicians with either treating or examining relationships to evaluate Plaintiff's physical functional limitations in this case. Furthermore, there is no clear medical opinion evidence in the record suggesting that their opinions are unsupported. Although Drs. Harvey and Siefert's opinions are somewhat inconsistent with one another, these distinctions did not give the ALJ justification to assign limitations less restrictive than both opinions.[6] Given these circumstances, it appears that the ALJ ultimately substituted her own medical judgment to determine that the objective medical evidence did not support the limitation findings of Drs. Harvey and Siefert.

_____

[5] As the Sixth Circuit has noted, "the process for diagnosing fibromyalgia involves testing for tenderness in focal points and ruling out other conditions." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007).

[6] Defendant maintains within briefing that the ALJ "had no way to reconcile the vast differences" between the opinions of Drs. Harvey and Siefert. (Mem. Opp'n 15, ECF No. 14.) Defendant maintains that the reason for this was that the doctors did not provide any explanation for their findings. The undersigned disagrees with this line of argument. Drs. Harvey and Siefert included diagnoses, prognoses, symptoms, clinical findings, and objective signs within their physical limitation evaluations. Additionally, the record contains treatment notes from both doctors to supplement their opinions. The reason the ALJ was unable to "reconcile" the opinions of Drs. Harvey and Siefert, or conclude whether the medical evidence supported either, is because the ALJ is not permitted to make such a medical determination and failed to rely on a different medical source.

Relatedly, substantial evidence does not support the physical RFC limitations the ALJ assigned to Plaintiff. The ALJ appears to base a number of her RFC findings, and most importantly her determination that Plaintiff could sit for six hours in a workday, on her own interpretation of the raw medical data. The ALJ did not credit any medical opinion evidence for such findings, nor are these findings readily apparent from either the medical or non-medical evidence. Rather, the ALJ appears to have concluded herself that the diagnostic testing and examination history would only justify the physical restrictions she ultimately assigned. (*See* R. at 20–21.) Finally, given the combination of Plaintiff's conditions and extensive treatment history, this is not the type of case where the medical evidence lends itself to a commonsense judgment regarding functional limitations. Under the circumstances of this case, the ALJ was not sufficiently qualified to reach RFC conclusions without the assistance of a medical source.

Furthermore, the ALJ's credibility determination, in and of itself, does not provide substantial evidence for the ALJ's ultimate RFC findings. The reasons the ALJ gave for discounting Plaintiff's credibility do not adequately support the functional limitations the ALJ assigned. For example, nothing from the ALJ's review of Plaintiff's credibility, including Plaintiff's daily activities, reasonably indicates Plaintiff is capable of sitting for six hours in a workday. Furthermore, even assuming a claimant is not credible, an RFC assessment must still consider the medical evidence. Because the current record suggests that the ALJ relied on her own medical judgment, it is simply unclear whether the ALJ's RFC determination accurately accounted for the medical evidence.

It is possible that the ALJ's RFC assessment, and rejection of the opinions of Drs. Harvey and Siefert, was based on the opinion evidence of the state agency physicians. At the

very end of her RFC assessment, the ALJ indicated that she "generally concurs with the reconsideration assessment of the state agency medical examiners." (R. at 22.) The ALJ may have made this statement to indicate that the physical RFC opinion of Dr. Klyop, which Dr. Villanueva later affirmed, supported the limitation findings within the RFC. Nevertheless, the record is unclear in this regard. The ALJ did not describe the state agency opinions with any level of detail, making it unclear to what extent these opinions match her RFC determination. Additionally, as detailed above, the current record does not provide sufficient information regarding the content of these opinions. It is also unclear what evidence Drs. Klyop and Villanueva actually considered in reaching their opinions. Under these circumstances, the undersigned is unwilling to conclude that these opinions are substantial evidence in support of the ALJ's RFC findings.

Accordingly, given the circumstances of this case, substantial evidence does not support the ALJ's decision. As detailed above, the record indicates that in weighing the medical evidence, the ALJ substituted her own medical judgment to discount the opinions of Drs. Harvey and Siefert. Furthermore, even assuming the ALJ was justified in rejecting the opinions Drs. Harvey and Siefert, and discounting the credibility of Plaintiff, substantial evidence must still support the ALJ's own RFC determination. The RFC determination falls short here, because the ALJ relied on her own opinion in reducing relatively complex medical evidence into functional limitations as well as state agency medical opinions that she did not adequately make part of the administrative record.

B.    Remand

If substantial evidence does not support the Commissioner's decision, the Court must

decide the nature of remand. The Court has the discretion to enter "upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The United States Court of Appeals for the Sixth Circuit has emphasized that "[i]f a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

Here, remand for further consideration is the appropriate course. The ALJ appears to base her decision on her independent distillation of the medical data in order to arrive at Plaintiff's functional limitations. While the current record does not adequately support the ALJ's determinations, this does not necessarily mean that the ALJ will ultimately prove incorrect. *Cf. Brewer v. Astrue*, No. 1:10–cv–01224, 2011 WL 2461341, at *6 (N.D. Ohio June 17, 2011) ("Although the ALJ's assumption appears reasonable to a lay person and might ultimately be correct, he has no special expertise to make such an assumption."). Accordingly, the undersigned is unwilling to conclude that all essential factual issues have been resolved.

## VIII. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **REMAND** this case for further proceedings consistent with this Report and Recommendation. Furthermore, it is **RECOMMENDED** that the Court **DENY WITHOUT PREJUDICE** Plaintiff's request for an award of attorney's fees pursuant to the Equal Access to Justice Act and allow for consideration of this issue, if Plaintiff chooses to so move, upon separate motion.

## IX. NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   February 3, 2012                                    /s/ *Elizabeth A. Preston Deavers*
                                                            Elizabeth A. Preston Deavers
                                                            United States Magistrate Judge